# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

WAUPACA NORTHWOODS, LLC,

        Plaintiff,

v.                                                          Case No. 10-C-459

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA, et al.

        Defendants.

## DECISION AND ORDER

This case presents an insurance coverage dispute involving a policy issued by Defendant Travelers Casualty and Surety Company to Plaintiff Waupaca Northwoods, LLC ("Waupaca"), a supplier of lawn and garden products. In 2009, Waupaca notified Travelers that one of its employees, Randy Neider, had taken company assets while employed as a plant manager at a Waupaca plant in Idaho. Specifically, it was alleged that Neider had stolen Waupaca's supplies and inventory over an extended period of time. After an investigation, Travelers denied coverage under its commercial crime policy on the grounds that Waupaca had known that Neider had committed dishonest acts in the past. It now moves for summary judgment. For the reasons given below, the motion will be denied.

As in any insurance dispute, the policy language takes center stage. Travelers concedes that the applicable language covers employee theft, but the policy also contains the following material condition:

> This Crime Policy terminates as to any Employee:
>
> a. As soon as your partner, any of your Management Staff Members or any Employee with managerial or supervisory responsibility not in collusion with the Employee becomes aware of any dishonest or fraudulent employment related act involving an amount in excess of one thousand dollars ($1,000);

(DPFOF ¶ 38.)

Prior to his employment with Waupaca, Randy Neider was employed at a company called Pace International, in South Dakota. In 1998, Travelers states that a Pace vice-president named David Shaffer terminated Neider (or allowed him to resign) because he had learned that Neider had used company assets for his own personal use. In particular, he had instructed Pace employees to build a fence at his house. The value of the employees' time spent building the fence was deemed to be $1,438. In Waupaca's version of events, Shaffer knew all along about Neider's intention to use company employees to build his fence. While both men were working at Pace International, Neider became upset when Pace would not honor his request for vacation time or pay that he believed he was owed after working several years without taking a vacation. Neider testified that Shaffer, his supervisor at the time, sympathized with him and hinted that there were other ways of recouping the money Neider believed he was owed. (Wiegert Aff., Ex. D at 22-23, 68, 95.) Waupaca argues that Shaffer and Neider were in collusion on the fence-building project.

In any event, soon after Neider was let go from his job at Pace International, parts of Pace were purchased by Waupaca, and Shaffer became a Waupaca vice-president. Late in 1998, Shaffer and Waupaca's president met with Neider at a breakfast meeting in Idaho, and they hired Neider to be the plant manager at Waupaca's Idaho facility. After a few years in Idaho, Neider allegedly began stealing company equipment.

2

Travelers' position is straightforward. The key language of the termination clause cited above provides that the crime policy terminates "As to any Employee . . . . [a]s soon as . . . . any of your Management Staff Members . . . becomes aware of any dishonest or fraudulent employment related act" committed by such Employee. (DPFOF ¶ 38.) Travelers argues that Neider committed a dishonest employment act (misappropriating company labor) while employed at Pace, and it further alleges that he did so with Shaffer's knowledge. Shaffer qualifies as a Management Staff Member of Waupaca (as defined in the policy), and so his knowledge of Neider's past dishonest act means that the crime policy is terminated.

Waupaca argues, however, that the termination clause does not apply because Shaffer's knowledge was obtained *before* the policy was even active. The key phrase in the termination clause provides that the crime policy terminates "as soon as" a manager learns of dishonest conduct, which implies that the dishonest conduct, or at least the knowledge of it, must occur *while* the policy is in effect. Shaffer learned about Neider's conduct in 1998 – ten years before the policy at issue here became effective – and thus the termination clause does not apply. Under Travelers' interpretation, the policy was never actually in force as to Neider because Shaffer learned about Neider's conduct in 1998. In Waupaca's view, something that is never effective cannot later terminate.

Travelers argues that it would not make sense to allow a corporate manager to retain secret knowledge of his employees' previous dishonest acts and then obtain a valid policy covering potential theft. The whole point of the termination provision is to prevent a company from obtaining insurance for losses that it has the ability to predict and / or prevent. If a company wants

3

to hire an employee with a dishonest past, that is its prerogative, but then that company must not expect an insurer to assume the risk that attends that employee's relationship with the company. Waupaca concedes that such a result might be a fine social or economic policy, but the only policy at issue here is a policy of insurance, which provides otherwise. An insurer's duty to its insured is determined by the language the insurer uses in its policy, not the underlying policy that the insurer intends that language to reflect.

If an insurer intends to exclude losses caused by any of its insured's employees who have a prior record of dishonesty, including dishonesty that precedes the effective date of the policy, from its theft coverage, it may certainly do so. But it must use language that makes its intent clear to its insured. Travelers failed to do so here. The language it used simply does not convey the intent it claims it had. It is easy to draft language that would cover the circumstances at issue here. For example, in *St. Joe Paper Co. v. Hartford Acc. & Indem. Co.,* the relevant provisions "preclude coverage after the insured or an officer of the insured . . . discovers or has knowledge or information 'that such Employee has committed any fraudulent or dishonest act in the service of the Insured or otherwise, *whether such act be committed before or after the date of the employment by the Insured.*" 376 F.2d 33, 35 (5th Cir. 1967) (italics added). Such a clause would clarify that termination or exclusion of coverage relates back to *any* employee dishonest conduct, not just conduct that arose after the policy became effective. But by stating that the coverage provided under the policy terminates "as soon as" a manager "becomes aware of" the employee's dishonest conduct, the policy suggests that such "awareness" must be in the present or future, not the past.

Waupaca cites *Home Savings Bank v. Colonial American Cas. and Sur. Co.,* where Colonial had issued a fidelity bond to Home Savings Bank, in North Carolina. 598 S.E.2d 265, 267 (N.C.

4

Ct. App. 2004). Prior to purchasing the bond, Home Savings Bank was aware that one of its tellers had a conviction for embezzlement. When this employee was found to have later embezzled more than one million dollars from the bank, Colonial denied coverage on the grounds that the bank had already known about the employee's prior conviction at the time it purchased the policy. The termination clause in the applicable bond had the same "as soon as" language as the policy in the present case. The North Carolina Court of Appeals rejected the notion that the bond's termination clause was triggered by knowledge that pre-existed the bond's purchase:

> Significantly, the termination clause provides that the bond "terminates . . . as soon as" Home Savings "learns" of any dishonest conduct by an employee. Use of the present, rather than past, tense here suggests an intent by the parties that coverage under the bond must first commence before discovery of an employee's dishonest conduct will operate to terminate it.

*Id.* at 270. At a minimum, the *Home Savings Bank* court concluded that the policy language was ambiguous, and under principles of insurance contract construction any ambiguity must be resolved in favor of coverage. *Id.*

Travelers does not address *Home Savings Bank*, other than to note that it is the decision of a "lower court of appeals" that has yet to be cited by another court, but argues instead that many other cases cut the other way. For example, in *Cooper Sportswear Mfg. Co. v. Hartford Cas. Ins. Co,* the court described a "uniform line of cases" holding that coverage for an employee ceased if the insured had learned of a dishonest act by that employee prior to the inception of the policy. 818 F. Supp. 721, 724 (D. N.J. 1993). In that case, the company's secretary-treasurer possessed information, prior to obtaining the relevant Hartford policy, that the employee in question had committed dishonest acts in the past. Hartford denied coverage and the district court ruled in its favor. The policy "excludes coverage for any employee from the time the employer has 'knowledge

5

or information' that the employee has acted fraudulently or dishonestly. Here, the insured had such 'knowledge or information' prior to the issuance of Hartford's policy. Hartford, therefore, is entitled to summary judgment and the dismissal of Cooper's complaint." 818 F. Supp. at 725.

The Fourth Circuit reached a similar conclusion in *C. Douglas Wilson & Co. v. Insurance Co. of North America, Philadelphia, Pa.,* 590 F.2d 1275 (4th Cir. 1979). There, one of the policies contained language stating that "This bond shall be deemed terminated or cancelled as to any Employee (a) as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee . . ." *Id.* at 1277 n.3. The court concluded (over a dissent) that the bond precluded liability on the part of the insurer because the employer knew about past dishonest conduct prior to obtaining the policies: "Since we conclude that Barksdale's false certification of pre-advances constitutes dishonesty as a matter of law and that Wilson had knowledge of it before the inception of the INA and Hartford policies . . . we sustain the conclusion of the district court that under the terms of their respective policies INA and Hartford cannot be held liable for Wilson's losses." *Id.* at 1279.

Waupaca distinguishes these cases by noting that they involve coverage being excluded or cancelled rather than what we have here, which is a provision that *terminates* the policy as to the dishonest employee. Although coverage logically can be excluded based on knowledge of prior events, a provision that "terminates" coverage based on prior events makes no sense. Otherwise, the policy would "terminate," albeit only as to the employee with a history of dishonesty, before it ever became effective. Waupaca also notes that the cases cited by Travelers engage in only cursory examinations of the question, whereas the *Home Savings Bank* courts (both the trial and appellate courts) reached their conclusions only after a detailed analysis of the issue.

I am satisfied that Waupaca's argument is more persuasive. First, ambiguities should be construed in favor of coverage, a rule of construction that is particularly true with respect to coverage exclusions. "It is fundamental in Wisconsin that 'ambiguities in coverage are to be construed in favor of coverage, while exclusions are narrowly construed against the insurer.'" *Whirlpool Corp. v. Ziebert,* 197 Wis.2d 144, 152, 539 N.W.2d 883, 886 (Wis. 1995) (quoting *Smith v. Atlantic Mut. Ins. Co.,* 155 Wis.2d 808, 811, 456 N.W.2d 597, 598 (1990)). As the *Home Savings Bank* court found, the language at issue here is at least ambiguous, particularly because it uses the present tense. The policy terminates when a manager "be*comes* aware of any dishonest or fraudulent employment related act," which seems to suggest that if a manager be*came* aware of a dishonest act *prior* to coverage, the clause is not triggered. (DPFOF ¶ 38.) And when the policy says that it will "terminate" upon a manager becoming aware of dishonesty (as opposed to a clause "excluding" coverage) the policy suggests that coverage will exist for some given period of time before it could terminate. It could not, in other words, "terminate" upon its very inception. Given that the triggering event for the termination is stated in the words "as soon as" the manager "becomes aware," a reasonable person would likely expect that the provision is aimed only at knowledge that is gained after the effective date of the policy, not before. It is just such an expectation on the part of an insured that Wisconsin courts look to in construing ambiguous provisions in insurance policies. *See Badger Mutual Insurance Co. v. Schmitz*, 2002 WI 98, ¶ 51, 255 Wis.2d 61, 647 N.W.2d 223 ("To construe ambiguous language in an insurance policy, we attempt to determine what a reasonable person in the position of the insured would have understood the words of the policy to mean.") (internal quotes omitted). And, as noted above, drafting language

7

to exclude what Travelers now wants to exclude would not have been difficult. Accordingly, I find that the absence of clearer language excluding coverage for pre-existing knowledge of dishonest acts is another factor supportive of ambiguity.

But is such a result a windfall for an insured who conceals material information from his insurer? Not necessarily. Here, there were apparently no questions on the application relating to pre-existing knowledge of dishonest conduct. *See Home Savings Bank,* 598 S.E.2d at 266 ("The application for bond coverage did not contain any questions asking if Home Savings was aware of any prior dishonest or fraudulent conduct on the part of its employees . . .") Had the insurer wanted to preclude coverage for employees with pre-existing dishonesty issues, it would have been a relatively simple undertaking to tackle that problem within the context of the insurance application, just as life insurers ask about pre-existing medical conditions. Moreover, the dishonest conduct Travelers cites in this case, as well as the insured's decision to hire Neider, occurred a decade before the effective date of the policy, and so there can be no suggestion that Waupaca was deliberately attempting to employ a known theft risk and obtain coverage for that risk at the same time. Finally, it is quite a jump from building a fence with company employees as a means of obtaining unauthorized compensation for unused vacation time to systematically embezzling the company's own supplies and inventory. Only one with 20/20 hindsight would suggest that Waupaca should have seen this theft coming.

In sum, I am satisfied that Wisconsin courts would construe the ambiguous clause at issue here against the insurer and in favor of coverage. Accordingly, Travelers' motion for summary

judgment on that basis is **DENIED**. The clerk will place the case on the calendar for a telephone conference to address further scheduling.

**SO ORDERED** this   25th   day of April, 2011.

                                            s/ William C. Griesbach
                                            William C. Griesbach
                                            United States District Judge